# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs July 8, 2015

## IN RE M.A.P. ET AL.

### Appeal from the Juvenile Court for Sullivan County (City of Bristol)
### Nos. BCJ 15088    Randy M. Kennedy, Judge

### No. E2014-02413-COA-R3-PT – Filed January 29, 2016

This is a termination of parental rights case. The Department of Children's Services (DCS) filed a petition to terminate the parental rights of A.C.P. (Mother) with respect to her three minor children, ages twenty-two months to six years at the time of trial. The trial court found clear and convincing evidence of grounds. The court found the same quantum of evidence supporting the conclusion that termination of Mother's rights is in the children's best interest.[1] Mother appeals. As modified, we affirm the trial court's judgment.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
### Affirmed as Modified ; Case Remanded

CHARLES D. SUSANO, JR., J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and JOHN W. MCCLARTY, J., joined.

Daniel J. Cantwell, Kingsport, Tennessee, for the appellant, A.C.P.

Herbert H. Slatery III, Attorney General and Reporter, and Jason I. Coleman, Assistant Attorney General, Nashville, Tennessee, for the appellee, Department of Children's Services.

### OPINION

---

[1] The trial court also terminated the parental rights of M.A.C., the biological father of the two older children. He did not appeal the order. Mother's paramour, T.W.S., is the presumed biological father of the youngest child and was also named in DCS's petition. T.W.S. has not established paternity of the child. He signed a waiver of interest and notice of the proceedings in this matter. Neither M.A.C. nor T.W.S. is a party to this appeal.

I.

DCS became involved in November 2013 after learning T.W.S, a registered sex offender, was living in the residence of Mother and her three children, M.A.P., J.S.P., and L.R.P. (collectively, "the children"). The children's maternal grandmother lived in the same residence. T.W.S. was arrested for "violating the Sex Offender Registry," and Mother and Grandmother were arrested for "Facilitation of a Violation of the Sex Offender Registry," according to Lieutenant Debbie Richmond, a detective with the Bristol City Police Department. Following the arrests, the court entered a no-contact order prohibiting T.W.S. from having any contact with the children. The order further provided that, should Mother violate the order, it "shall be considered exigent circumstances" to remove the children. Mother was aware of the order. DCS then returned the children to Mother's custody. On January 17, 2014, local police observed T.W.S. at Mother's home with the children present. The children were removed from Mother's home, and the State was granted custody. While in State custody, M.A.P. indicated that T.W.S. had sexually abused her. J.S.P. also made specific sexual abuse allegations against T.W.S., saying he had abused both her and M.A.P. DCS investigated. When confronted, Mother insisted the children were lying and defended T.W.S. The court suspended Mother's visitation until the investigation was complete.

When the children were taken into State custody, Mother was unemployed and living with Grandmother in a one-bedroom apartment described at trial as "very dirty" and roach-infested. On February 18, 2014, Mother signed the permanency plan, which she and DCS developed together with the goal of returning the children to her. Most notably, the plan required Mother to pay child support each month and obey court orders, as well as obtain stable housing and a stable income. Mother signed the "Criteria and Procedures for Termination of Parental Rights," which explained that willful failure to make reasonable child support payments for four consecutive months could result in involuntary termination of parental rights. In its order ratifying the permanency plan, the court found the children "dependent and neglected."

On June 20, 2014, DCS filed its petition to terminate Mother's parental rights. A bench trial was held on September 15, 2014. Ultimately, the trial court held that the State proved, by clear and convincing evidence, three grounds for termination, abandonment by failure to support, abandonment by failure to provide a suitable home, and substantial noncompliance with the permanency plan.[2] The court also found clear and convincing evidence that termination was in the children's best interest. Mother appeals.

---

[2] In its petition, DCS alleged a fourth ground, "severe child abuse." The trial court declined to terminate on this ground, holding it did "not have enough proof that [Mother] knew the children were being sexually abused by [T.W.S.]." DCS does not challenge this holding.

## II.

In her brief, Mother raises the following issues, which we repeat verbatim:

Whether or not DCS'[s] petition for Termination of Mother's Parental Rights was ripe to be heard due to the Guardian Ad Litem [(GAL)] filing a petition for Termination of Mother's Parental Right[s];

Whether there was clear and convincing evidence to terminate the Mother's parental rights on the basis of Abandonment by failure to support[;].

Whether there was clear and convincing evidence to terminate the Mother's parental rights on the basis of failure to provide a suitable home;

Whether there was clear and convincing evidence to terminate the Mother's parental rights [on the] basis of substantial noncompliance with the permanency plans; and

Whether there was clear and convincing evidence that termination of the Mother's parental rights were in the minor children's best interest.

(Paragraph numbering in original omitted.)

## III.

On our review, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). The trial court's findings of fact are reviewed de novo upon the record accompanied by a presumption of correctness unless the preponderance of the evidence is against those findings. *Id.*; Tenn. R. App. P. 13(d). "We review all issues of law de novo upon the record with no presumption of correctness." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing *Union Carbide Corp. v. Huddleston,* 854 S.W.2d 87, 91 (Tenn.1993)). "When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to witnesses' credibility." *In re Keri C.*, 384 S.W.3d 731, 744 (Tenn. Ct. App. 2010) (citation omitted).

"Both the United States and Tennessee Constitutions protect a parent's right to the custody and upbringing of his or her child." *In re Swanson*, 2 S.W.3d 180, 187 (Tenn.

1999) (citing ***Stanley v. Illinois***, 405 U.S. 645, 650 (1972); ***Nale v. Robertson***, 871 S.W.2d 674, 678 (Tenn.1994)). This right is not absolute and may be terminated if – and only if – "a court finds that one or more of the statutorily defined grounds for termination has been established by clear and convincing evidence." ***Jones v. Garrett***, 92 S.W.3d 835, 838 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(g)). "Clear and convincing evidence" is 'evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.' " ***In re Valentine***, 79 S.W.3d 539, 546 (Tenn. 2002) (quoting ***Hodges v. S.C. Toof & Co.,*** 833 S.W.2d 896, 901 n. 3 (Tenn. 1992)).

Proof of just one ground for termination by clear and convincing evidence can support the termination of a parent's rights. ***In re Valentine***, 79 S.W.3d at 546 (citing ***In re C.W.W.***, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000)). To terminate parental rights, a court also must determine that clear and convincing evidence demonstrates that termination is in the best interest of a child. ***In re Valentine***, 79 S.W.3d at 546 (citing Tenn. Code Ann. § 36-1-113(c)). "The federal and state constitutions require the opportunity for an individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." ***In re Swanson***, 2 S.W.3d at 188 (citing ***Stanley***, 405 U.S. at 658-59; ***Bond v. McKenzie (In re Adoption of Female Child)***, 896 S.W.2d 546, 548 (Tenn. 1995)).

IV.

We first address the issue of ripeness. On May 14, 2014, the children's GAL filed a petition to terminate Mother's rights citing only one ground, severe abuse. No trial was ever held on this petition. On June 20, 2014, DCS filed a petition to terminate Mother's parental rights citing severe abuse and three other grounds. Mother argues DCS's petition was not ripe for judicial review because of the pending petition filed by the GAL. She claims DCS's petition should not have been heard before "the [GAL] non-suited, dismissed, or otherwise disposed of his petition." We disagree.

Ripeness considers "whether the dispute has matured to the point that it warrants a judicial decision. The central concern of the ripeness doctrine is whether the case involves uncertain or contingent future events that may or may not occur as anticipated or, indeed, may not occur at all." ***B & B Enters. of Wilson Cty., LLC v. City of Lebanon***, 318 S.W.3d 839, 848 (Tenn. 2010) (citing ***Lewis v. Cont'l Bank Corp.***, 494 U.S. 472, 479-80 (1990)). To determine whether a dispute is ripe, we apply a two-part test: (1) whether the issues in the case are ones appropriate for judicial resolution; and (2) whether the court's refusal to act will cause hardship to the parties. ***B & B Enterprises***, 318 S.W.3d at 848-49 (internal citations omitted).

4

As to part one of the test, Mother argues that, if the GAL had won, then "DCS'[s] petition would not be appropriate for judicial resolution, because Mother would no longer have any parental rights to terminate." But as DCS points out in its brief, quoting **B & B Enters. LLC**, 318 S.W.3d at 848, Mother's analysis "relies on the very 'uncertain or contingent future events . . .' that the ripeness doctrine seeks to avoid." As to part two of the test, Mother argues that the court's refusal to hear DCS's petition would not cause hardship to the parties because DCS and the GAL shared a single goal – terminating parental rights.

At the outset, we note that DCS's petition is clearly justiciable. Tenn. Code Ann. § 36-1-113(g) (2014). Significantly, Mother does not argue the issue of "whether the dispute . . . [has] matured to the point that it warrants a judicial decision." **B&B Enterprises**, 318 S.W.3d at 848. We hold that the GAL's petition to terminate did not "preclude a new petition by different parties who are authorized to seek termination under Tenn. Code Ann. § 36-1-113(b)." **H.M.R. v. J.K.F.**, No. E2004-00497-COA-R3-PT, 2004 WL 1944138, at *3 (Tenn. Ct. App. E.S., filed Sept. 1, 2004). Additionally, in this case, the GAL participated in the trial on DCS's petition and the court considered the sole ground raised by the GAL. For all these reasons, we hold that the issues raised in DCS's petition were ripe for judicial review.

Mother also contends that DCS could have joined the GAL's petition, or vice versa, under Tenn. R. Civ. P. 18.01.[3] However, this rule does not require the joinder of two claims brought against the same individual by two independent parties in separate proceedings. Accordingly, this issue is found adverse to Mother.

V.

A.

As previously noted, the trial court found cause to terminate Mother's parental rights on three grounds – abandonment by failure to support, abandonment by failure to provide a suitable home, and failure to substantially comply with the permanency plan. We now consider whether the State proved grounds for termination by the requisite standard of clear and convincing evidence.

---

[3] This rule provides that "[a] party asserting a claim to relief as an original claim, counterclaim, cross-claim, or third party claim, may join, either as independent or as alternate claims, as many claims, legal or equitable, in contract or tort, as the party has against an opposing party." Tenn. R. Civ. P. 18.01.

B.

Abandonment by failure to support occurs if for the "four (4) consecutive months immediately preceding the filing of a proceeding or pleading to terminate the parental rights of the parent . . . the parent . . . willfully failed to make reasonable payments toward the support of the child." Tenn. Code Ann. § 36-1-102(1)(A)(i) (2014) (*see also* Tenn. Code Ann. § 36-1-113(g)(1)). Proof that a parent failed to pay support during the pertinent four-month period, standing alone, is insufficient to prove this ground. *In re Keri C*., 384 S.W.3d at 746 (citing *In re M.J.B.,* 140 S.W.3d 643, 655 (Tenn. Ct. App. 2004)). "The evidence must establish that the parent's failure to support was 'willful.' " *Id.* (citing *Kleshinski (In re Adoption of Kleshenski)*, No. M2004-00986-COA-R3-CV, 2005 WL 1046796, at *18 (Tenn. Ct. App. M.S., filed May 4, 2005)). In this context,

> [w]illful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.
>
> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so.

*In re Audrey S.*, 182 S.W.3d 838, 863-64 (Tenn. Ct. App. 2005) (footnote and internal citations omitted). Because "[i]ntent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions[,] . . . triers-of-fact must infer intent from the circumstantial evidence, including a person's actions or conduct." *State, Dep't of Children's Servs. v. Culbertson*, 152 S.W.3d 513, 524 (Tenn. Ct. App. 2004) (quoting *In re Adoption of Muir*, No. M2002-02963-COA-R3-CV, 2003 WL 22794524, at *5 (Tenn. Ct. App. M.S., filed Nov. 25, 2003)). We note that DCS filed their petition to terminate parental rights on June 20, 2014. Therefore, the four-month period at issue for this ground of termination is February 20, 2014 to June 19, 2014.

In accordance with the established public policy of Tennessee, "a parent has a duty to support a child, regardless of whether there is a prior court order requiring such." *In re Shandajha A.G.*, No. E2012-02579-COA-R3-PT, 2013 WL 3787594, at *8 (Tenn. Ct. App. E.S., filed July 17, 2013) (citing *In re M.A.C*, No. M2007-01981-COA-R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. M.S., filed July 17, 2008); Tenn. Code Ann. § 36-1-102(1)(H)). Similarly, a child has a right to receive support just as a parent has an obligation to pay it. *In re Jacobe M.J.*, 434 S.W.3d 565, 572 (Tenn. Ct. App. 2013) (quoting *State ex rel. Hayes v. Carter*, No. W2005-02136-COA-R3-JV, 2006 WL

6

2002577, at *2 (Tenn. Ct. App. W.S., filed July 6, 2006)). Every parent over the age of eighteen is presumed to have knowledge of the obligation to support his or her child. *In re Jacobe M.J.*, 434 S.W.3d at 572.

At trial, Mother testified that she had the ability to pay, but had not yet made any support payments for her children. She argues DCS failed to prove by clear and convincing evidence that her failure to support was "willful." She contends that she was not ordered to pay child support until June 12, 2014. In her brief, Mother questions how she can be faulted when the permanency plan required her to contact Child Support Enforcement (CSE) to set up payments, she did so, and the child support court did not set her child support payments until more than four months later.

Here, Mother was over the age of eighteen during the four-month period in question and, therefore, was presumed to know of her obligation to support her children regardless of a court order. Tenn. Code Ann. § 36-1-102(1)(H); *In re Shandajha A.G.*, 2013 WL 3787594, at *8. Further, by signing the permanency plan, which she did before the relevant four-month period began, Mother acknowledged her obligation to "be responsible for making monthly child support payments" for each of her three children. In addition to this obligation, the same plan instructed Mother to inform CSE "of her child's status in the custody of [DCS]" and required her to do so before the end of February 2014, the month she signed the plan. The plan provided CSE's address and phone number. Mother testified she did not contact CSE until April or May 2014. For these reasons, we find that Mother was aware of her duty to support. However, for more than half of the relevant four-month period, Mother had a specific order from the court to pay zero in support. Prior to contacting CSE, the trial court ordered Mother, on March 24, 2014, to pay "$0.00 per month as current support, pending: his [sic] search for employment; or XX medical proof of his [sic] claim for disability." (Emphasis removed from original.) We note that there is no indication in the record that Mother actually applied for disability payments or submitted medical proof of her disability claim. We also note that by June 2014, the same court ordered Mother to make monthly payments of $50 for L.R.P. and $50 for J.S.P., with the first payment due July 1.[4]

When the four-month period began on February 20, 2014, Mother was presumed to know of her duty to support. This obligation was paused on March 24, 2014, with the court's order to pay zero support. The court modified this order on June 12, 2014, but the first payment was not due until after the relevant four-month period had ended. Therefore, Mother was obligated to pay support only about one-fourth of the time – from February 20 until March 24 – in the relevant four-month period. Mother did not pay support in this time. However, in the context of this case, her failure to pay for *one*

---

[4] It is unclear from the record why the court did not also order Mother to make a similar monthly support payment for M.A.P.

7

*month* is insufficient to establish she willfully failed to make reasonable support payments for a *four-month period*.

Ultimately, Mother did not provide any financial support for the children until sometime after mid-September 2014, in defiance of the permanency plan and eventually a court order. Still, a finding of abandonment for failure to support considers only the four consecutive months immediately preceding the filing of the petition. Tenn. Code Ann. § 36-1-102(1)(A)(i); Tenn. Code Ann. § 36-1-113(g)(1). We modify the trial court's judgment to delete as a ground for termination the failure to pay child support.

C.

Under Tenn. Code Ann. §§ 36-1-113(g)(1) and -102, parental rights may be terminated due to abandonment for failure to provide a suitable home when

> [t]he child has been removed from the home of the parent . . . as the result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child, as defined in § 37-1-102, and the child was placed in the custody of the department or a licensed child-placing agency, that the juvenile court found, . . . that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent . . . to establish a suitable home for the child, but that the parent . . . [has] made no reasonable efforts to provide a suitable home and [has] demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent . . . in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent . . . toward the same goal, when the parent . . . is aware that the child is in the custody of the department[.]

Tenn. Code Ann. § 36-1-102(1)(A)(ii) (*see also* Tenn. Code Ann. § 36-1-113(g)(1). Although, as a *general proposition*, DCS is not required "to prove by clear and convincing evidence that it made reasonable efforts to reunify as a precondition to termination of parental rights," *In re Kaliyah S.*, 455 S.W.3d 533, 555, n.34 (Tenn. 2015), the above statute specifically requires DCS "to make reasonable efforts to assist

parents in establishing a suitable home. . . ." *In re Jamel H.*, No. E2014-02539-COA-R3-PT, 2015 WL 4197220, at *6, n.4 (Tenn. Ct. App. E.S., filed July 13, 2015). We note that because the children here were removed from Mother's home on January 17, 2014, the relevant four-month period that we must consider under the above statute is four months from the date of removal, or January 18, 2014 to May 17, 2014.

Here, DCS temporarily removed the children from Mother's home in November 2013 after discovering a sex offender living there. The court responded by issuing a no-contact order barring T.W.S. from contact with the children. The court also returned the children to Mother's home and ordered DCS to open a Family Support Services case. In January 2014, T.W.S. was discovered again at Mother's home in the presence of the children. DCS filed a petition for and was granted temporary legal custody. The court found that in Mother's home, the children were "subject to an immediate threat to [their] health or safety to the extent that delay for a hearing would be likely to result in severe or irreparable harm." The court declared the children "dependent and neglected."

Both times the children were removed from Mother's home, Mother and the children were residing with Grandmother in Grandmother's one-bedroom apartment. Mother testified that in the apartment, her two older children slept on a mattress in an alcove below a staircase. Her youngest slept in a playpen. Mother slept on a mattress on the living room floor. Lieutenant Debbie Richmond, a detective with the Bristol City Police Department, was inside the apartment to remove the children in January 2014. She testified to observing, among other things, that the home was "very cluttered, very dirty," "stank like cat feces and cat urine," and that a clothes pile took up almost an entire room.

In relevant part, the permanency plan stated "[Mother] is currently staying with [Grandmother]. [Grandmother]'s home is not big enough for the family." The plan also stated that Mother "will obtain housing that is appropriate for her family"; "will provide [DCS] with a copy of her lease agreement within two weeks of obtaining housing"; and "will have beds for each of her children and storage for each child."

Clark testified that in February 2014 she gave Mother information on obtaining public housing. Clark later learned that Mother's criminal background disqualified her from public housing. Clark testified that she also advised Mother about how to work with the appropriate court clerk's office to clear her criminal record so she could regain eligibility for public housing. The permanency plan also instructed Mother's to "contact the clerk[']s office in [Virginia] in person or by telephone to get the theft charges off her record. [Mother] will call the clerk[']s office weekly until this is resolved." There is no evidence Mother followed through. Since Mother did not qualify for public housing, Clark also alerted Mother to several available local rental properties in her price range.

On April 8, 2014, Clark completed a home visit at Grandmother's apartment, where Mother still resided. Clark found the residence unsuitable for Mother and the children. She testified that the apartment is "very small," not large enough even for Mother and Grandmother, and that there was nowhere for the children to sleep. During the visit, Clark also observed a smell of body odor and cat feces and that the home was infested with roaches. She testified that at one point during the visit, Mother "even flipped a roach off of her." Mother admitted at trial in September that their apartment had a roach problem, but stated the landlord was taking care of it. In a case note about the home visit, Clark also noted "[t]he bathroom has no door. . . . There is no privacy in the home."

Clark testified that she was not aware of any efforts Mother had made to obtain suitable housing. As of the September 2014 trial date, Mother reported that she still resided with Grandmother in the same apartment. Mother signed a lease for a new apartment on October 22, 2014, the date the trial court's decision regarding her parental rights was announced. The trial court found DCS sufficiently proved abandonment through failure to provide a suitable home. The court stated in its order:

> . . . [Mother] arrives today a month after the trial and indicates that she has a home and has now paid her support; however it is too late.
>
> The Court finds that [DCS] provided reasonable efforts to [Mother] to assist her with finding a suitable home. DCS provided her with information about homes in the area that were available for rent in her price range and encouraged her to find suitable housing.
>
> *   *   *
>
> The proof showed that the mother's [sic] was living in her mother's one bedroom apartment and the home was not appropriate for children. . . .

(Paragraph numbering in original omitted.) We find the evidence supports the trial court's findings of fact and conclusion of law on this issue. Therefore, based on the above facts and applicable law, we hold the evidence does not preponderate against the trial court's finding, by clear and convincing proof, that Mother abandoned her children by failing to provide a suitable home.

D.

Parental rights may be terminated when "[t]here has been substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan . . . ." Tenn. Code Ann. § 36-1-113(g)(2). To establish cause for termination on this ground, DCS "must demonstrate first that the requirements of the permanency plan are reasonable and related to remedying the conditions that caused the child to be removed from the parent's custody in the first place." *In re M.J.B.*, 140 S.W.3d at 656 (citations omitted). Additionally, the State must prove "that the parent's noncompliance is substantial in light of the degree of noncompliance and the importance of the particular requirement that has not been met. Trivial, minor, or technical deviations from a permanency plan's requirements will not be deemed to amount to substantial noncompliance." *Id.* (citations omitted).

The goal of the plan in this case was to return the children to Mother by a target date of August 14, 2014. The permanency plan required Mother to obey all court orders, ensure her children had no contact with T.W.S., refrain from mentioning T.W.S. to her children, pay child support, obtain safe and stable housing, obtain a legal source of income, contact the appropriate court clerk weekly until the issues with her criminal record had been resolved, continue in her mental health treatment until released by providers, complete a parenting assessment, and follow any recommendations from the parenting assessment. The plan also noted that Mother was working toward her GED. Mother was required to show DCS a regular list of the jobs for which she had applied.

The trial court ratified the permanency plan on February 26, 2014, finding it "reasonable" and "reasonably related to the reasons the children came into custody." As in *In re B.D.*, "[t]he order . . . makes no further mention of specifically how these requirements are reasonably related to a remedying the conditions that brought about removal." No. M2008-01174-COA-R3-PT, 2009 WL 528922, at *7 (Tenn. Ct. App. M.S., filed Mar. 2, 2009). " 'Because the trial court made no finding regarding the reasonableness of [the mother's] responsibilities under the permanency plans, our review of this issue is de novo.' " *Id.* at *7, n.7 (quoting *In re Valentine*, 79 S.W.3d at 547).

According to the plan, DCS removed the children from Mother's home because she violated a no-contact order barring T.W.S. from contact with the children. The plan stated, in part, that Mother "has consistently shown she is not willing to abide by court orders to keep her children safe" and that she "has a history of making parenting decisions that place her children at risk of substantial harm." Given the incident that triggered the children's removal and Mother's living situation at that time, we hold the plan's goals are "reasonable and related to remedying" the conditions that led to the removal and meeting the shared goal of returning the children to a parent.

11

Based on testimony at trial, Mother underwent the parenting assessment and completed the intensive parenting education recommended based on the assessment. Mother also made progress toward earning her GED. Mother did keep T.W.S. from her children.

Despite these successes, Mother has failed to complete some of the most critical aspects of the permanency plan. First, she was not compliant with the goals related to her mental health care. By her own account, Mother "stopped going [to therapy] and talking to her [therapist] because I didn't like her and she didn't want to listen to what I had to say." Second, she failed to pay any child support prior to trial, though we note she was ordered to provide zero support for a period of about three months. Third, she did not obtain employment until a few weeks before trial and did not sign a lease for a new apartment until the morning the court announced its decision. Fourth, Mother gave no indication that she contacted the Virginia clerk's office to remove past criminal charges from her record. And finally, Mother continued to disregard court orders. For months, she ignored a court order to pay child support, despite admitting at trial that she had the ability to pay. Testimony from the children's therapist revealed Mother also violated the court's order suspending her visitation with the children.

The trial court found clear and convincing evidence established Mother "did very little toward complying with the Permanency Plan" while "DCS did everything the Court was asking them to do to provide assistance" and "made reasonable efforts" to help Mother accomplish the plan's goals. The evidence does not preponderate against the trial court's finding, by clear and convincing evidence, that Mother was in substantial noncompliance with the permanency plan.

VI.

Although promotion of the child's best interest is the ultimate goal of each proceeding involving the care and custody of a child, the child's best interest does "not become the paramount consideration until the trial court has determined that the parent is unfit based on clear and convincing evidence of one or more of the grounds for termination listed in Tenn. Code Ann. § 36-1-113(g)." *In re Audrey S.*, 182 S.W.3d at 877. Once a ground for termination has been established, as is the case here, "the interests of the parents and the child diverge. . . [and] the focus of the proceedings shifts to the best interest of the child." *Id.* At that time, "the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *In re Jacobe M.J.*, 434 S.W. at 572 (citing *White v. Moody,* 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)). Tenn. Code Ann. § 36-1-113(i) provides a non-exhaustive list of factors to be considered in determining a child's best interest in a termination of parental rights case. *In re Jacobe M.J.*, 434 S.W.3d at 573. In part, these are:

(1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent . . . ;

(2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

                    *       *       *

(4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent . . . or other person residing with the parent . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i)(1)-(2), (4)-(9).

In the current case, Mother has not made such a change in circumstances or her conduct for it to be safe for or in the best interest of the children to return them to Mother's home. Most significantly, Mother has not ended her relationship with T.W.S. Previously, allowing T.W.S. to be in her home with the children carried significant personal consequences for Mother, namely losing custody of her children and spending several days in jail. But T.W.S.'s presence also appears to have brought significant harm to her children. Her two older children indicated T.W.S. sexually abused them. In her first foster home, M.A.P. stimulated another child, later explaining they were "playing best friends" as she and T.W.S. had done. J.S.P. directly alleged that in the basement of their grandmother's home, T.W.S. inappropriately touched both her and M.A.P. Mother was made aware of these allegations. Clark testified that Mother's response was to call her children liars, fervently defend T.W.S., and say Clark "could keep her [expletive] children."

As evidence of Mother's continued involvement with T.W.S., Clark testified that on four separate occasions in the summer of 2014, she observed Mother and T.W.S. together near Mother's home and in downtown Bristol. Detective Eric Sargent of the Bristol Police Department testified that on September 2, 2014 – only a few weeks before the trial on DCS's petition to terminate – he arrested T.W.S. at a bus stop and that Mother was with T.W.S. at the time. Further, upon his arrest, T.W.S. gave Mother his personal property for safekeeping. At trial, Mother either denied these instances or dismissed them as coincidences. She denied still having a relationship with T.W.S. The trial court's order stated, "[Mother] maintains, even though she wants us to believe she does not, a relationship with a registered sex offender, who the Court believes sexually assaulted her children." Further, Mother has previously shown a disregard for court orders concerning her children's safety. Because of her ongoing involvement with T.W.S. and history of disregard for court orders regarding her children's safety, we find Mother has not made a lasting adjustment such that it would be safe or in the children's best interest to return then to her home, as clearly shown by a preponderance of the evidence.

Despite reasonable efforts by DCS, Mother also has not made "lasting adjustments" in her housing or employment. Mother obtained employment about one month before trial and new housing about one month after. She also failed to make progress on her mental health issues and failed to timely pay support for the children.

Testimony at trial revealed the children "are doing very well" in foster care and meeting their development milestones. M.A.P. and J.S.P. are both receiving counseling for sexual abuse. Clark testified that the two older children reported feeling safe in their foster home. For these reasons, we hold that the evidence does not preponderate against the trial court's finding that it is in the children's best interest to terminate Mother's parental rights.

## VII.

The judgment of the trial court is affirmed as modified. Costs on appeal are taxed to the appellant, A.C.P. This case is remanded to the trial court for enforcement of the court's judgment as modified and for collection of costs assessed in the trial court.

_____
CHARLES D. SUSANO, JR., JUDGE